

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 1 5 2021

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

SHAVONDA SMITH

PLAINTIFF

VS.                    NO. _____3:21-cv-00015 DPM_____

PAXTON MEDIA GROUP, LLC; and
DAVID M. PAXTON, President and CEO,
Individually and in his official capacity

DEFENDANTS

This case assigned to District Judge_____MARSHALL
and to Magistrate Judge_____RAY

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND
DAMAGES FROM RACKETEERING, CONSPIRACY TO ENGAGE IN A PATTERN
OF RACKETEERING ACTIVITY, RELATED CLAIMS, SPECIFIC PERFORMANCE
AND DISCRIMINATION PURSUANT TO 42 U.S.C § 1981**

Comes Plaintiff, Shavonda Smith ("Smith"), by and through her attorney, Larry J. Steele,

and for her Verified Complaint for Declaratory and Injunctive Relief and Damages From

Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, Related Claims,

Specific Performance and Discrimination pursuant to 42 U.S.C. § 1981, states:

JURISDICTION AND VENUE

1.      This Honorable Court has original jurisdiction pursuant to the Civil RICO remedies

at 18 U.S.C. §§ 1964, and the holdings of the U.S. Supreme Court in *Tafflin v. Levitt*, 493 U.S.

455 (1990). This Honorable Court also has jurisdiction pursuant to 42 U.S.C. § 1981 and 28 U.S.C.

§ 1322(a).

2.      "Except as provided in subsections (b) and (c) or as expressly provided otherwise

by federal statute, in any civil action of which the district courts have original jurisdiction, the

district courts shall have supplemental jurisdiction over all other claims that are so related to claims

in the action within such original jurisdiction that they form part of the same case or controversy

under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a). Many of the state law claims asserted herein by Plaintiff as hereinafter set forth can be heard by this Court as a matter of supplemental jurisdiction.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 USC § 1332(a) because the matter in controversy exceeds the jurisdictional threshold, exclusive of costs, it is between citizens of different states, and because the Defendants have certain minimum contacts with the State of Arkansas such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

4.      Venue in the United States District Court for the Eastern District of Arkansas, Northern Division, is proper pursuant to 28 USC § 1391(a)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims and causes of action occurred in this judicial district, and because Defendants were subject to personal jurisdiction in this judicial district at the time of the commencement of this action.

5.      Plaintiff is entitled to relief for racial discriminatory acts, fraud, breach of contract, pursuant to 42 U.S.C. § 1981.  Plaintiff also states a cause of action against the Defendants for violating the Arkansas Civil Rights Act.

6.      42 U.S.C. § 1981 states that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

## STATEMENT OF FEDERAL JURISDICTION

7.      This is a civil action under 18 USC §1964)(a)(c)("Civil  RICO" for Racketeer Influenced and Corrupt Organizations Act ("RICO") remedies authorized by 18 U.S.C. § 1961, et seq., for declaratory and injunctive relief, for actual, consequential and exemplary damages, and for all other relief, both legal and equitable, which this Court deems just and proper under all circumstances which have occasioned this Complaint. This Court has subject matter jurisdiction to enter a declaratory judgment under 28 USC § 2201 et seq. as part of the relief requested.

8.      The primary cause of this Civil RICO action and basis for requested relief is a criminal enterprise of which Defendants were members engaged in a pattern of racketeering activity across state lines, and formation of a conspiracy to engage in racketeering activity involving numerous RICO predicate acts committed during the past ten (10) calendar years.

9.      Defendants were at all relevant times members of "an association in fact" existing in conspiratorial and illegal purpose.

10.     The predicate acts alleged here involving Defendants cluster around promoting fraud, breach of contract, and race discrimination in Craighead County, Arkansas, eventually resulting in intimidation by Defendants and/or agents of Defendants of Plaintiff Smith regarding Smith Contract with Defendants Paxton Media and David M. Paxton as a means of further harassment and intimidation of Smith.  Defendants' agents' conduct included, but was not limited to, failure to pay Contract fees owed to Plaintiff Smith while under contract.  Such willful and intentional acts caused Smith both physical pain and emotional damage to her suffering, and invaded her privacy.

11.     The primary objective of the racketeering enterprise has been to encourage Plaintiff Smith to refrain from seeking fulfillment of the Contract agreement and inflict severe and sustained

3

economic hardship upon Smith while she was under Contract, with the intent of impairing, obstructing, preventing, and discouraging her from seeking damages from Defendants.

12.     This Court has original jurisdiction of this action pursuant to the federal Civil RICO act remedies at 18 U.S.C. §§ 1964 et seq., and the holdings of the U.S. Supreme Court in *Tafflin v. Levitt*, 493 U.S. 455 (1990).

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 USC § 2201 et seq. and personal jurisdiction over the parties pursuant to Ark. Code Ann. § 16-4-101 and other applicable provisions of Arkansas law as (a) acts complained of took place in Arkansas and Plaintiff Smith is a long-time resident of the State of Arkansas; (b) Defendant Paxtom Media Group, LLC is a foreign for-profit Kentucky Limited Liability Company duly organized and doing business under the laws of the State of Kentucky, and is in fact transacting business for profit in the state of Arkansas, with an appointed agent for service of process who is conducting for profit substantial regular business in this state.

14.     Venue is established under 28 USC § 1965 and the corresponding provisions of state law including but not limited to A.C.A. § 16-4-101 as the subject matter of this action is the personal injury of the Plaintiff and loss of his property interest in his employment.

15.     A civil RICO (Racketeer Influenced and Corrupt Organizations Act) action is therefore alleged against Defendants, Paxton Media Group, LLC and David M. Paxton, not just based on fraud.

SUPPLEMENTAL JURISDICTION

16.     "Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims

in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a).  Many of the state law claims asserted herein by Plaintiff as hereinafter set forth can be heard by this Court as a matter of supplemental jurisdiction.

17.      This is a legal action seeking compensatory and punitive damages as well as equitable remedies.

18.      Plaintiff timely filed a Charge of Discrimination on the basis of race and retaliation with the Equal Employment Opportunity Commission ("EEOC") and received a Notice of Suit Rights on or about 10-21-2020, attached hereto as *"Exhibit A."*

## PARTIES

19.      The Plaintiff is an African American citizen who resided in Jonesboro, Craighead County, Arkansas at all relevant times, but is now a resident of Fayetteville, Washington County, Arkansas.

20.      Defendant, Paxton Media Group, LLC ("Paxton Media"), is a foreign for-profit Kentucky Limited Liability Company organized under the laws of the State of Kentucky, doing business in Arkansas.  At all relevant times, Paxton Media has been and is now doing business in the State of Arkansas and the City of Jonesboro, and has continuously had and does now have at least 80 employees. Paxton Media is a privately held media company with holdings that include newspapers and TV station WPSD-TV in Paducah, Kentucky. The company owns at least 32 daily newspapers and numerous weekly newspapers, mostly in the southern United States.

21.      Defendant David M. Paxton, is President and CEO of Defendant Paxton Media.

22.     Defendant Paxton Media's registered agent for service is James Paxton, 201 South 4th Street, Paducah, Kentucky 42003.

COUNT I
(RICO)

23.     This is a civil action for Racketeer Influenced and Corrupt Organizations Act ("RICO") remedies authorized by the federal statutes at 18 U.S.C. § 1961, et seq., for declaratory and injunctive relief, for actual, consequential and exemplary damages, and for all other relief which this Honorable Court deems just and proper under all circumstances which have occasioned this Complaint, see 18 U.S.C. §§ 1964(a) and (c) ("Civil RICO"), including specific performance and discrimination pursuant to 42 U.S.C. § 1981.

24.     The primary cause of this action is a criminal enterprise engaged in a pattern of racketeering activity across state lines, and a conspiracy to engage in racketeering activity involving numerous RICO predicate acts during the past ten (10) calendar years.

25.     Defendants were at all relevant times an association in fact existing in purpose.

26.     The predicate acts alleged here cluster around fraud and breach of contract in the delivery of newspapers, specifically, the contract, intimidation of witnesses, tampering with evidence, harassment by physical confrontation of witnesses, and obstruction of justice.

27.     The primary objective of the racketeering enterprise has been to inflict severe and sustained economic hardship upon Plaintiff, with the intent of impairing, obstructing, and preventing Plaintiff from receiving benefits, income, based on the contract.

FACTS

28.     Plaintiff Smith signed an Independent Contractor Distributor Agreement ("Contract") with Defendant Paxton Media, as an independent contractor distributor on January 21, 2020, delivering *The Sun* newspaper in Jonesboro, Craighead County, Arkansas, and

surrounding counties, as well as contracts to deliver papers on separate routes. *(Exhibits B, C, D and E)*

29.     Beginning in the middle of February 2020 the publisher, Defendant Paxton Media, began cheating Plaintiff Smith on her pay under the Contracts.

30.     Every week since the middle of February 2020, Defendant Paxton Media has broken the agreement regarding pay for delivery although Plaintiff demanded payment.

31.     Several white newspaper distributors complained and were repaid the shortages they were due.

32.     Plaintiff Smith has been discriminated against based on her pay under the Contract because of her race, African American.

33.     As a direct and proximate result of the breach of the Contract by Defendant Paxton Media, and conduct of the Defendant, David M. Paxton, President and CEO, Plaintiff has been injured monetarily, approximately $14,000.00. Plaintiff is entitled to recover treble damages from Defendants, pursuant to RICO, more particularly described.

34.     Although Plaintiff Smith fulfilled the terms of her Contract with Defendant Paxton Media, to date, Defendants Paxton Media and David M. Paxton have willfully failed to fulfill the terms of the Contract.

35.     Any act done or declaration made by or of the conspirators in furtherance, aid or preparation of the alleged conspiracy may be shown as evidence against his or her fellow conspirators.

36.     Defendants Paxton Media and David M. Paxton, President and CEO, were, are, an association in fact existing as an enterprise for the purpose of performing illegal acts as more fully described.

7

37.     Plaintiff seeks equitable as well as legal relief from said enterprise, from Defendants Paxton Media, David M. Paxton, President and CEO, and his agents, Defendants Tom Smith and Leslie Prouin, Publishers/Representatives.

38.     An element of a RICO relationship exists between the Defendants and the enterprise, specifically, fraud and intimidation. 18 U.S.C.A. § 1962 (a-c).

39.     Plaintiff is entitled to recover from Defendants prejudgment interest and attorney's fees.

40.     Defendant, David M. Paxton, gave Tom Smith, Circulation Manager/Home Delivery Manager, and Leslie Prouin, Representative, authority as his agents and attorneys in fact, on behalf of Paxton Media Group, LLC, elected to breach the Contracts.

COUNT II
(42 U.S.C. § 1981)

41.     Plaintiff incorporates herein by reference all preceding paragraphs of this Complaint as if fully set forth herein.

42.     Arkansas Code Annotated § 5-71-208, Harassment, states:

> (a)     a person commits the offense of harassment if, with purpose to harass, annoy, or alarm another person, without cause, he or she:

> (5)     engages in conduct or repeatedly commits an act that alarms or seriously annoys another person and that serves no legitimate purpose.

43.     Plaintiffs should have damages for Defendants conduct described, in an amount more than is required for federal court diversity jurisdiction.

44.     But for racial animus, Defendants Paxton Media and David M. Paxton would have honored the Contract with Plaintiff Smith.

45.     Plaintiff Smith's activities include the right to "make and enforce contracts as enjoyed by white citizens." *Comcast v. Nat'l Ass'n of African Am.-Owned* Media, 140 S. Ct. 1009 (2020).

46.     Plaintiff Smith's 42 U.S.C. § 1981 race discrimination claim has a contractual interest as its basis. *Comcast, supra.*

47.     Plaintiff Smith has proven intentional racial discrimination by Defendants as follows:

    A.     she is a member of a racial minority; and

    B.     she was discriminated against within a particular group of activities within the statute, the right to make and enforce contracts as is enjoyed by white citizens.

COUNT III
(Specific Performance)

48.     Plaintiff incorporates herein by reference all preceding paragraphs of this Complaint as if fully set forth herein.

49.     Plaintiff requests the Court enter an Order requiring Defendants to comply with and specifically perform the terms of the contract, the subject of this action.

WHEREFORE, pursuant to 18 U.S.C. § 1964 (a) and (c), Plaintiff requests judgment against all named Defendants as follows:

That this Court find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged in and whose activities did affect interstate and foreign commerce in violation of 18 U.S.C. § 1962 (b);

That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits or advantages attributable to all violations of 18 U.S.C. § 1962 (b), according to the proof;

That all Defendants pay to Plaintiff treble damages under authority of 18 U.S.C. § 1964 (c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. § 1962 (b), according to the proof;

That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequences of Defendants several violations of 18 U.S.C. § 1962 (b), according to the proof;

That all Defendants pay to Plaintiff her costs of the lawsuit incurred herein, including, but not limited to, all necessary research, all nonjudicial enforcement, and reasonable attorney's fees at a minimum of $250.00 per hour worked which is Plaintiff's counsel's standard professional rate;

Plaintiff requests the Court enter an Order requiring Defendants to comply with and specifically perform the terms of the contract, the subject of this action; and

Grant such other and further relief as is equitable and just.

<u>JURY TRIAL DEMANDED</u>

Plaintiff requests a jury trial on all questions of fact raised by this Complaint.

Respectfully submitted,

LARRY J. STEELE PLC

By: _Larry J. Steele_

LARRY J. STEELE (78146)
225 West Elm Street
P.O. Box 561
Walnut Ridge, AR  72476-0561
(870) 886-5840
(870) 886-5873 fax
*Attorney for Plaintiff, Shavonda Smith*

10

## VERIFICATION

STATE OF ARKANSAS    )
                  )ss.
COUNTY OF RANDOLPH   )

I, SHAVONDA SMITH, the undersigned, after being duly sworn, state on oath that the facts and matters contained in the foregoing Verified Complaint for Declaratory and Injunctive Relief and Damages From Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, Related Claims, Specific Performance and Discrimination Pursuant to 42 U.S.C. § 1981 are true and correct to the best of my knowledge, information and belief.

Shavonda Smith

On this 15th day of January, 2021, personally appeared before me, the undersigned, a Notary Public in and for the County and State aforesaid, SHAVONDA SMITH, to me well known to be the person whose name appears above, after being duly sworn, stated the facts and matters contained in the foregoing Verified Complaint for Declaratory and Injunctive Relief and Damages From Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, Related Claims, Specific Performance and Discrimination Pursuant to 42 U.S.C. § 1981 are true and correct to the best of her knowledge, information and belief.

My Commission Expires:

09-25-2022

Janet A. Steele
Notary Public

OFFICIAL SEAL - #12389103
**JANET A. STEELE**
NOTARY PUBLIC-ARKANSAS
RANDOLPH COUNTY
MY COMMISSION EXPIRES: 09-25-22

11

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To: **Shavonda Smith**
**3320 Caraway Commons Drive**
**Jonesboro, AR 72404**

From: **Little Rock Area Office**
**820 Louisiana**
**Suite 200**
**Little Rock, AR 72201**

| | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 493-2021-00101 | **Rita Barnes,** **Enforcement Supervisor** | **(501) 324-5552** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[X] Other *(briefly state)*    **Contract employee (self-employed)**

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

10-21-2020

Enclosures(s)

**William A. Cash, Jr.,**
**Area Office Director**

*(Date Mailed)*

cc:   **Eric Rudolph**
**Vice-President**
**PAXTON MEDIA GROUP**
**201 South 4th Street**
**Paducah, KY 42003**

**Larry Steele**
**LARRY J STEELE PLC**
**PO BOX 561**
**Walnut Ridge, AR 72476**



**EXHIBIT**

*A*

Jonesboro Sun -

# Schedule of Wholesale Rates:

| | Wholesale Rate | | Publication Name | | Frequency | | Route |
|---|---|---|---|---|---|---|---|
| $ | .4100 | per home-delivery copy of | SUN | delivered as a | MTWTF | subscription on Route | 72 |
| $ | .6584 | per home-delivery copy of | SUN | delivered as a | SFS | subscription on Route | 72 |
| $ | .4114 | per home-delivery copy of | SUN | delivered as a | SMTWTFS | subscription on Route | 72 |
| $ | .5616 | per home-delivery copy of | SUN | delivered as a | SM~~TWTFS~~ | subscription on Route | 72 |
| $ | .5000 | per home-delivery copy of | SUN | delivered as a | S | subscription on Route | 72 |
| $ | .4067 | per home-delivery copy of | SUN | delivered as a | SMS | subscription on Route | 72 |
| $ | | per home-delivery copy of | | delivered as a | | subscription on Route | |
| $ | | per home-delivery copy of | | delivered as a | | subscription on Route | |

_Distributor_ _(signature)_

_Date_ _February 27, 2020_

_Publisher's Representative_ _(signature)_

_Date_ _2/27/20_

NEA -

# Schedule of Rates:

| | Delivery Fee | | Publication Name | | Route |
|---|---|---|---|---|---|
| $ | 0.0600 | per home-delivery copy of | NEA124 | delivered on Route | NEA072 |
| $ | | per home-delivery copy of | | delivered on Route | |

_Distributor_ _(signature)_

_Date_ _February 27, 2020_

_Publisher's Representative_ _(signature)_

_Date_ _2/27/20_

**EXHIBIT B**

## INDEPENDENT CONTRACTOR DISTRIBUTOR AGREEMENT

Paxton   Media   Group   _____   ("Publisher"),   **and**   _____ ("Distributor")have   entered   into   the   following   contract   and   agreement   ("Agreement"),   in consideration of their mutual promises and agreements.

**WHEREAS**, Publisher may from time to time require the services of an independent business enterprise to deliver the newspapers it publishes; and

**WHEREAS**, Distributor warrants that he/she operates an independent business enterprise which is capable of providing, and desires to provide, the aforementioned services to Publisher;

**NOW, THEREFORE,** for and in consideration of the mutual promises, warranties and undertakings of the parties, it is agreed as follows:

1.     Distributor shall be primarily responsible for the satisfactory delivery of designated publications and products in the nonexclusive territories which are listed on the Schedules which are attached to this Agreement and which are incorporated herein by specific reference elsewhere in this Agreement. Each territory is referred to herein as a "Route" and collectively as "Routes". It is agreed that Publisher may sell its newspapers directly to customers on Distributor's Routes. Further, Publisher reserves the right to modify and change the Routes indicated on the Schedule(s) upon at least thirty (30) days advance written notice to Distributor. Distributor agrees to deliver newspapers received from Publisher as soon as practicable after the delivery of said newspapers from Publisher to Distributor.

2.     ☒ A* ☐ N/A*

(a)     Publisher agrees to sell and Distributor agrees to purchase as many copies of Publisher's designated home delivery publications as Distributor shall require to fulfill the obligations created by this Agreement, together with such additional quantities of such newspapers as Distributor shall order from time to time. Title to newspapers shall pass from Publisher to Distributor immediately upon Publisher's delivery of the newspapers to the mutually agreed-upon pickup point, at which time Distributor assumes the risk of loss regarding damaged, destroyed, stolen, lost or unsold newspapers and all credit risks respecting payments by persons served by Distributor.

(b)     Distributor agrees to purchase newspapers received by Distributor pursuant to Paragraph 2(a), at the wholesale rates in effect at the time of sale. The wholesale rates which are in effect at the time of the execution of this Agreement are indicated in the "Schedule of Wholesale Rates," which is attached hereto and incorporated herein by this reference.

(c)     Distributor agrees to pay in full for newspapers received from Publisher pursuant to Paragraph 2(a) by the 10th day of each month. Failure to pay in full by the specified date shall be deemed a material breach of this Agreement. A $30°° service charge will be issued on all returned checks, and payments thereafter must take the form of a money order or cashier's check. It is agreed that Publisher shall have the right to modify the wholesale price or rate for

---

* Check the "A" box if the paragraph is applicable to the Distributor and the "N/A" box if the paragraph is not applicable to the Distributor

* Check the "A" box if the paragraph is applicable to the Distributor and the "N/A" box if the paragraph is not applicable to the Distributor

newspapers sold to Distributor under this Agreement from time to time, such modification to the wholesale rate being effective thirty (30) days after notice of the rate change is given to Distributor. On all accounts not paid by the due date, interest at a rate up to the amount permitted by applicable state law may be charged from the due date to the date paid.

3.       ☒ A   ☐ N/A

Publisher agrees to supply Distributor with copies of Publisher's designated home delivery publications for distribution by Distributor pursuant to the terms of this Agreement.   All publications received by Distributor pursuant to this Paragraph 3 are and shall remain the exclusive property of Publisher.   Accordingly, Distributor shall have no risk of loss regarding such publications and all credit risks respecting payments by customers for publications, if any, shall remain with Publisher.  However, nothing herein shall limit Distributor's liability to Publisher for the value of publications which are damaged, destroyed, stolen or lost after receipt of such publications from Publisher and prior to delivery by Distributor.  Distributor agrees that Distributor will not set the price, if any, of publications delivered pursuant to this Paragraph 3 and that Distributor will not charge customers or anyone other than Publisher for the delivery of publications pursuant to this Paragraph 3. Publisher shall pay Distributor the fees indicated in the "Schedule of Delivery Fees," which is attached hereto and incorporated herein by this reference, for distribution of home delivery publications by Distributor pursuant to this Paragraph 3.  Publisher shall have the right to modify the fees in the Schedule of Delivery Fees, any such change being effective upon thirty (30) days advance written notice to Distributor.   The parties agree that Distributor's remuneration under this Paragraph 3 is directly related to Distributor's output rather than the number of hours of work performed by Distributor.

4.       ☒ A   ☐ N/A

Publisher will from time to time designate products, such as post it notes and product samples, for delivery on Distributor's Route(s) and Publisher will pay Distributor a fee, which shall be determined and established by Publisher on an ongoing basis, for each product delivered by Distributor pursuant to this Paragraph 4. The parties agree that Distributor's remuneration under this Paragraph 4 is directly related to Distributor's output rather than the number of hours of work performed by Distributor.

5.       ☒ A   ☐ N/A

Distributor recognizes that Publisher maintains contracts with other publishers regarding the distribution of their publications and that Publisher does not own such publications (collectively "Non-owned Publications"). The Non-owned Publications, and the fee payable for the delivery of each such publication, are listed on the Schedule of Non-owned Publications which is attached hereto and incorporated herein by this reference. Publisher will from time to time designate Non-owned Publications for delivery on Distributor's Route(s) and Publisher agrees to pay Distributor the applicable delivery fee, indicated on the Schedule of Non-owned Publications, for each copy of the applicable Non-owned Publication which Distributor delivers on the Route(s).  Distributor agrees to begin delivering any such designated Non-owned Publications on the Route(s) immediately upon notification from Publisher that the Non-owned Publication has been designated for delivery on the Route(s). All Non-owed Publications received by Distributor pursuant to this Paragraph 5 are not and shall not be the property of Distributor and Distributor shall have no

ownership interest in those publications. Accordingly, Distributor shall have no risk of loss regarding such Non-owned Publications and shall have no credit risks respecting payments by customers for Non-owned Publications, if any. However, nothing herein shall limit Distributor's liability to Publisher for the value of Non-owned Publications which are damaged, destroyed, stolen or lost after receipt of such Non-owned Publications from Publisher and prior to delivery by Distributor. Distributor agrees that Distributor will not set the price, if any, of Non-owned Publications delivered pursuant to this Paragraph 5 and that Distributor will not charge customers or anyone other than Publisher for the delivery of publications pursuant to this Paragraph 5. Publisher shall have the right to modify the fees in the Schedule of Non-owned Publications, any such change being effective upon thirty (30) days advance written notice to Distributor. The parties agree that Distributor's remuneration under this Paragraph 5 is directly related to Distributor's output rather than the number of hours of work performed by Distributor.

6.      ☒ A   ☐ N/A

Distributor acknowledges receipt from Publisher of a list of locations where bundles of newspapers ("Newspaper Bundles") are to be dropped ("Drop Locations"). Distributor agrees to deliver all Newspaper Bundles to Drop Locations according to the terms of this Agreement. All newspapers in Newspaper Bundles are and shall remain the exclusive property of Publisher and at no time shall Distributor have title to those newspapers or Newspaper Bundles. However, nothing herein shall limit Distributor's liability to Publisher for copies of newspapers and/or for Newspaper Bundles, damaged, destroyed, stolen or lost after receipt of same by Distributor and before delivery to Drop Locations. Distributor shall not impose any charge for delivery or other services related to the distribution of Newspaper Bundles apart from the fees indicated in this paragraph which are payable from Publisher to Distributor.

$____.50____ per delivery to a Drop Location when there are between ___1___ and ___50___ Drop Locations on the Route.

6A.      DISTRIBUTOR agrees to purchase said newspapers for distribution in newspaper racks from PUBLISHER at the wholesale rates of ___.45___ per daily and ___1.15___ per Sunday copy. It is agreed that DISTRIBUTOR will furnish locks for said newspaper racks located within their APR.

Publisher shall have the right to modify the fee(s) set forth above, any such change being effective upon thirty (14) days advance written notice to Distributor. The parties agree that Distributor's remuneration under this Paragraph 6 is directly related to Distributor's output rather than the number of hours of work performed by Distributor. Distributor shall also pick up and deliver to Publisher unsold newspapers being returned to Publisher by single copy distributors.

7.      Distributor will provide, at his/her own expense, a substitute of Distributor's choice capable of performing the obligations of Distributor hereunder in the event of Distributor's illness, disability or absence, or if for any other reason Distributor is unable to perform his/her responsibilities under this Agreement. Additionally, Distributor agrees not to assign this Agreement or any right or obligation arising hereunder, without the prior written consent of Publisher.

3

8.    Distributor warrants that he/she operates an independent business enterprise, Distributor exercising sole and exclusive control over the manner and means employed by Distributor in operating his/her business. Consequently, Distributor is and shall remain an independent contractor, solely responsible for (1) obtaining and maintaining vehicles used to perform delivery services; (2) paying all expenses incurred in providing delivery services; (3) selecting and controlling the means, facilities, tools and equipment used to perform delivery services; (4) hiring, compensating, controlling and discharging persons utilized by him/her to provide delivery services; and (5) satisfying all obligations concerning applicable taxes to (a) Federal; (b) State; (c) County; and (d) City Government. In particular, and without limiting the foregoing, Publisher will not treat Distributor as an employee for Federal tax purposes.

Further, Distributor acknowledges that he/she has neither paid nor agreed to pay anything of value for the rights and obligations conferred upon Distributor hereunder, and that the sole and only consideration given by either party is set forth within this Agreement.

9.    As an independent contractor Distributor is not acting for or on behalf of or as an agent of Publisher and shall have no power, right, or authority to bind Publisher in any manner whatsoever. All persons retained by Distributor to perform his/her obligations under this Agreement shall be subject solely to Distributor's control and are selected exclusively by Distributor at his/her sole liability and expense.

10.    Distributor acknowledges receipt from Publisher of a list containing the locations of all customers on Distributor's Routes. Distributor agrees that these records are the sole property of Publisher and that those records shall be delivered to Publisher at any time upon demand and in the event of the termination of this Agreement for any reason. Distributor further agrees that the list shall not be transferred or exhibited to any other person or firm; provided however, Distributor may exhibit the list to any of Distributor's employees or agents that require the information therein to accomplish deliveries under this Agreement. Distributor acknowledges that he/she shall not acquire, by this Agreement or otherwise, any proprietary interest or any other property right or interest in Distributor's Routes or in the list furnished Distributor by Publisher. Distributor agrees to convey all "new start" requests to Publisher. Distributor also acknowledges receipt from Publisher of certain property of Publisher, including single-copy keys, locks, apartment keys, slugs and entry codes, and agrees that this property of Publisher shall be delivered to Publisher at any time upon demand and in the event of the termination of this Agreement for any reason.

11.    In order that Publisher may comply with the requirements and regulations of the Audit Bureau of Circulations in its audit of the nature and extent of the distribution and circulation of Publisher's newspapers, and in order that Publisher may make accurate reports of its circulation as required by the Postal Laws and Regulations of the United States, Distributor agrees to furnish from time to time, upon request by Publisher, and not later than five (5) days after such request, an accurate list of his/her customers regularly purchasing and/or receiving Publisher's publications as a customer of Distributor and all collection records for said customers. Further, in the event of the termination of this Agreement for any reason, Distributor agrees to return the Route list and collection records to Publisher immediately.

12.    Publisher shall have no liability for any loss, damage or expense incurred or caused by Distributor in the performance of this Agreement. Distributor agrees to defend, indemnify, and

hold Publisher harmless from any and all liabilities, claims, demands, suits, costs, charges, and expenses including, but without limiting the foregoing, attorneys' fees incident to any claim, loss, damage, or injury to the person or property of Distributor or to the person or property of anyone injured through the acts or omissions of Distributor or Distributor's agents, employees, or other persons acting on Distributor's behalf. Distributor shall carry liability insurance on all vehicles which may be operated in the performance of this Agreement and general liability insurance covering all operations and premises, from a company of Distributor's choice, for the duration of this Agreement. Distributor agrees to provide certificates of insurance to Publisher as evidence of such coverage, and proof of a valid and current driver's license. In addition, Distributor agrees that he/she will carry workers' compensation insurance for his/her employees, if any, in accordance with applicable state law. The foregoing indemnification obligation of Distributor in this paragraph shall survive the termination of this Agreement, until the expiration of any time period established by law for bringing claims, demands, or legal proceedings with respect to which indemnification may be claimed under this paragraph. Moreover, for the duration of this Agreement, Distributor agrees to maintain on-route accident insurance coverage for Distributor and Distributor's substitute(s) while they are performing services under this Agreement. Distributor may either (i) elect to be covered under the on-route accident insurance policy offered to Distributor by a third party company, which is made available through Publisher or (ii) elect to procure and maintain equivalent on-route accident insurance coverage from a third party company of Distributor's choice. Distributor shall indicate which of these two options Distributor has selected by marking the applicable box below:

    (i)  ☑ Distributor elects to be covered by the on-route accident insurance policy made available through Publisher.

    (ii)  ☐ Distributor elects to procure and maintain equivalent on-route accident insurance coverage from a third party company.

In the event that Distributor elects option (ii) above, Distributor will provide Publisher with certificates of insurance evidencing that such insurance coverage has been procured and will be maintained by Distributor for the duration of this Agreement. Distributor agrees to furnish at its expense all required business licenses or registrations.

13. Within thirty (30) days of the termination of this Agreement by either party, Distributor will transfer to Publisher all monies that Distributor has received in advance from customers on his/her Routes for future sale and delivery of Publisher's publications, to the extent that Distributor has not yet fulfilled his obligations to those customers for future prepaid deliveries. Publisher shall hold said prepayments in trust for the respective customers of Distributor until such time as a new distributor shall contract to assume the Routes, at which time Publisher shall transfer said prepayments to the new distributor. This provision is for the benefit of both the respective customers on Distributor's Routes and the new distributor who will fulfill the future delivery obligations represented by such prepaid amounts, and under no circumstances shall any such prepayments become the funds or property of Publisher.

14. Distributor may engage in any other business or employment, including the delivery or sale of other publications or products, so long as it does not interfere or conflict with the performance of Distributor's obligations under this Agreement; provided, however, Distributor shall not stamp upon, attach to, or insert in copies of the newspapers and/or publications received from

Publisher any advertising matter not furnished by Publisher nor shall Distributor insert such newspapers and/or publications within any imprinted wrapping, covering, or container not furnished by Publisher.

15.     Distributor shall not use any trademarks, trade names, slogans, or logos owned by Publisher without Publisher's prior written consent.  In particular, but without limitation of the generality of the foregoing, Distributor may not display the name of any of Publisher's newspapers on any vehicle owned or used by Distributor.

16.  In the event that a customer on Distributor's Route(s) registers or makes a service complaint with Publisher relating to delivery of the customer's newspaper, Distributor agrees to pay Publisher the applicable fee described below for each such occurrence, to compensate Publisher for Publisher's costs and expenses associated with rectifying such complaint.  In that regard, Distributor will be charged a fee of $2 for each complaint by a customer of a missed delivery.  Distributor will be charged a fee of $4 for each complaint by a customer for any of the following:  late delivery, incomplete newspaper, torn or damaged newspaper, newspaper not tubed or wrong placement of newspaper, wet newspaper, wrong newspaper or issue delivered and/or failure to deliver any non-daily publication or supplemental product provided by Publisher.  Moreover, in the event that a representative of Publisher delivers a newspaper to a customer on Distributor's Route(s) in response to a service complaint received by Publisher, Distributor agrees to pay to Publisher a delivery charge of $2 , in addition to the foregoing fee(s), to compensate Publisher for Publisher's costs and expenses associated with making such delivery.  Distributor recognizes that starting delivery to new customers and administering customer vacation requests to the satisfaction of customers are both important results Distributor is to achieve under this Agreement.  In the event that Distributor fails to start delivery as requested by a customer or fails to administer vacation requests as requested by a customer, Distributor agrees to pay Publisher a fee of $5 for each such occurrence, to compensate Publisher for Publisher's costs and expenses associated with such failure.  Moreover, should Distributor default in the performance of this Agreement in any particular, Publisher may forthwith, and without notice, make other arrangements to effect delivery of the newspapers to subscribers on the Route(s), and all costs or expenses incurred in making such deliveries shall be deducted by Publisher from Distributor's compensation and/or from the bond or deposit established under Paragraph 19 herein.

17.     The following are Distributor's Minimum Performance Standards in effect as of the execution of this Agreement:

Customer Complaints: No more than 1.5 complaint(s) per thousand newspapers delivered.

In the event Distributor fails to meet the Minimum Performance Standards as set forth above, Publisher will notify Distributor of such failure and will provide Distributor an opportunity within seven (7) days to correct the notified deficiencies.  In the event Distributor fails to correct the notified deficiencies, Publisher may immediately terminate this Agreement.  Publisher may adjust the above minimum standards or add additional minimum standards upon at least thirty (30) days advance written notice to Distributor.

18.     It is mutually recognized that customer satisfaction is an essential element of this Agreement. It is further recognized that Distributor's failure to deliver his/her Route(s), or failure to

6

provide adequate notice of his/her intent to terminate this Agreement as required by Paragraph 20(a) below, would significantly impair Publisher's ability to ensure delivery of its publications to its customers, and that Publisher's damages in this respect are difficult to calculate precisely. It is therefore agreed that in the event Distributor fails to deliver his/her Route(s), or ceases to perform delivery services under this Agreement without first complying with the requirements of Paragraph 20(a), Publisher may charge Distributor, as liquidated damages, an amount of $75°° for each and every day that Distributor is in default of his/her delivery obligations, up to a maximum of thirty (30) days, which amount is a reasonable estimate of Publisher's damages. These liquidated damages may be charged against and deducted from Distributor's security bond or security deposit as established under Paragraph 19 herein. Further, in the event that the security bond or security deposit is not sufficient to satisfy the amount of liquidated damages due to Publisher from Distributor hereunder, Publisher may pursue payment of such additional amounts which are due and payable through any and all available legal action.

19.   ☒ A   ☐ N/A

Distributor agrees to secure payment of all sums that may become due and payable by Distributor to Publisher under the terms of this Agreement, in one of the following two ways:

(a)   DISTRIBUTOR will obtain a security bond in the amount of $ 1500°° from a company of DISTRIBUTOR's choice, licensed to do business in the State of Arkansas.

(b)   DISTRIBUTOR agrees to pay a non-refundable Bond Insurance to PUBLISHER with a company of PUBLISHER's choosing. For Bond Insurance in the amount of $ 1500°° , the amount of $ 375 will be charged to DISTRIBUTOR's account each billing period. PUBLISHER will not be responsible for any error in rates or charges beyond sixty (60) days.

Publisher shall not be limited to such security for any damage caused by or amounts due from Distributor.

20.   Unless terminated in a manner prescribed below, this Agreement shall continue in full force and effect as stated in Paragraph 22 herein. Moreover:

(a)   Either party may terminate this Agreement, with or without cause, upon at least thirty (30) days advance written notice to the other party.

(b)   Publisher may terminate this Agreement without prior notice upon Distributor's falsification of any report submitted to Publisher, commission of any wrongful act resulting in loss, damage or injury to Publisher, or any failure to satisfy the Minimum Performance Standards under Paragraph 17, and either party may terminate this Agreement without prior notice upon any breach of the terms of this Agreement by the other party.

(c)   Publisher may terminate this Agreement or suspend its performance hereunder without prior notice in the event Publisher's facilities are damaged or destroyed or Publisher's

performance hereunder is prevented or hindered by labor disturbances, including but not limited to strikes and picketing, or by acts of God, the elements, order of government, civil or military authority, or any other cause (whether similar or dissimilar to the above mentioned) not within the reasonable control of Publisher. Additionally, Publisher's obligations hereunder are expressly conditioned upon publication. In the event Publisher terminates publication of any of its newspapers or ceases to publish any editions thereof, this Agreement may be terminated by Publisher in its entirety during the period of time there is no publication or may be terminated ratably, to the extent of any cessation of publication of any edition thereof.

21.     This Agreement, including the Schedules attached hereto, is intended as the final, complete and exclusive statement of the terms of the parties' agreement. This Agreement cannot be modified in any respect except in writing signed by Distributor and Publisher's Circulation Manager. Publisher does not waive any contractual provision herein by failing to enforce it. Additionally, the parties agree that this Agreement, including the Schedules attached hereto, shall supersede all previous contracts or agreements, whether written or oral, between Publisher and Distributor.

22.     Subject to being earlier terminated as provided in paragraph 20 of this Agreement, the initial term of the Agreement shall commence on _February 27_____, 2020 and shall continue for an initial one (1) year period thereafter. The Agreement will subsequently automatically renew for successive periods of one (1) year each unless either party gives advance written notice to the other party of that party's decision not to renew the Agreement at least thirty (30) days prior to the end of the then current term, in which event the Agreement will terminate at the end of the then current term.

Distributor Signature

Print Name     Shaunda Smith

Phone No.     270-316-9894

Representative of Paxton Media Group     Lesli Brown

Date     2/27/20

Date     2/27/20

THIS CONTRACT AND AGREEMENT NOT BINDING ON PAXTON MEDIA GROUP
UNLESS SIGNED BY ITS CIRCULATION MANAGER
OR HOME DELIVERY MANAGER

By: _____
        CIRCULATION MANAGER/HOME DELIVERY MANAGER

Jonesboro Sun -

## Schedule of Wholesale Rates:

| Wholesale Rate | | | Publication Name | | Frequency | | Route |
|---|---|---|---|---|---|---|---|
| $ | | per home-delivery copy of | SUN | delivered as a | STF | subscription on Route | 177 |
| $ | .4000 | per home-delivery copy of | SUN | delivered as a | STWTF | subscription on Route | 177 |
| $ | | per home-delivery copy of | SUN | delivered as a | S | subscription on Route | 177 |

Distributor

Date  9/4/ 20

Publisher's Representative

Date  9/4/20

NEA -

## Schedule of Rates:

| Delivery Fee | | | Publication Name | | Route |
|---|---|---|---|---|---|
| $ | | per home-delivery copy of | | delivered on Route | |
| $ | | per home-delivery copy of | | delivered on Route | |

Distributor

Date

Publisher's Representative

Date  9/4/ 20



Rt 177

## INDEPENDENT CONTRACTOR DISTRIBUTOR AGREEMENT

Paxton   Media   Group   _____   ("Publisher").   and SHAVONDA SMITF ("Distributor")have   entered   into   the   following   contract   and   agreement   ("Agreement").   in consideration of their mutual promises and agreements.

**WHEREAS.** Publisher may from time to time require the services of an independent business enterprise to deliver the newspapers it publishes; and

**WHEREAS,** Distributor warrants that he/she operates an independent business enterprise which is capable of providing, and desires to provide, the aforementioned services to Publisher;

**NOW, THEREFORE,** for and in consideration of the mutual promises, warranties and undertakings of the parties. it is agreed as follows:

1.      Distributor shall be primarily responsible for the satisfactory delivery of designated publications and products in the nonexclusive territories which are listed on the Schedules which are attached to this Agreement and which are incorporated herein by specific reference elsewhere in this Agreement. Each territory is referred to herein as a "Route" and collectively as "Routes". It is agreed that Publisher may sell its newspapers directly to customers on Distributor's Routes. Further. Publisher reserves the right to modify and change the Routes indicated on the Schedule(s) upon at least thirty (30) days advance written notice to Distributor. Distributor agrees to deliver newspapers received from Publisher as soon as practicable after the delivery of said newspapers from Publisher to Distributor.

2.      ☐ A*  ☐ N/A*

(a)      Publisher agrees to sell and Distributor agrees to purchase as many copies of Publisher's designated home delivery publications as Distributor shall require to fulfill the obligations created by this Agreement. together with such additional quantities of such newspapers as Distributor shall order from time to time.  Title to newspapers shall pass from Publisher to Distributor immediately upon Publisher's delivery of the newspapers to the mutually agreed-upon pickup point. at which time Distributor assumes the risk of loss regarding damaged, destroyed, stolen. lost or unsold newspapers and all credit risks respecting payments by persons served by Distributor.

(b)      Distributor agrees to purchase newspapers received by Distributor pursuant to Paragraph 2(a). at the wholesale rates in effect at the time of sale. The wholesale rates which are in effect at the time of the execution of this Agreement are indicated in the "Schedule of Wholesale Rates." which is attached hereto and incorporated herein by this reference.

(c)      Distributor agrees to pay in full for newspapers received from Publisher pursuant to Paragraph 2(a) by the 10th day of each month. Failure to pay in full by the specified date shall be deemed a material breach of this Agreement. A $____ service charge will be issued on all returned checks. and payments thereafter must take the form of a money order or cashier's check.  It is agreed that Publisher shall have the right to modify the wholesale price or rate for

---

* Check the "A" box if the paragraph is applicable to the Distributor and the "N/A" box if the paragraph is not applicable to the Distributor

* Check the "N/A" box if the paragraph is applicable to the Distributor

newspapers sold to Distributor under this Agreement from time to time, such modification to the wholesale rate being effective thirty (30) days after notice of the rate change is given to Distributor. On all accounts not paid by the due date, interest at a rate up to the amount permitted by applicable state law may be charged from the due date to the date paid.

3.       ☐ A   ☐ N/A

Publisher agrees to supply Distributor with copies of Publisher's designated home delivery publications for distribution by Distributor pursuant to the terms of this Agreement.   All publications received by Distributor pursuant to this Paragraph 3 are and shall remain the exclusive property of Publisher.   Accordingly, Distributor shall have no risk of loss regarding such publications and all credit risks respecting payments by customers for publications, if any, shall remain with Publisher.   However, nothing herein shall limit Distributor's liability to Publisher for the value of publications which are damaged, destroyed, stolen or lost after receipt of such publications from Publisher and prior to delivery by Distributor.   Distributor agrees that Distributor will not set the price, if any, of publications delivered pursuant to this Paragraph 3 and that Distributor will not charge customers or anyone other than Publisher for the delivery of publications pursuant to this Paragraph 3. Publisher shall pay Distributor the fees indicated in the "Schedule of Delivery Fees," which is attached hereto and incorporated herein by this reference, for distribution of home delivery publications by Distributor pursuant to this Paragraph 3.   Publisher shall have the right to modify the fees in the Schedule of Delivery Fees, any such change being effective upon thirty (30) days advance written notice to Distributor.   The parties agree that Distributor's remuneration under this Paragraph 3 is directly related to Distributor's output rather than the number of hours of work performed by Distributor.

4.       ☐ A   ☐ N/A

Publisher will from time to time designate products, such as post it notes and product samples, for delivery on Distributor's Route(s) and Publisher will pay Distributor a fee, which shall be determined and established by Publisher on an ongoing basis, for each product delivered by Distributor pursuant to this Paragraph 4.   The parties agree that Distributor's remuneration under this Paragraph 4 is directly related to Distributor's output rather than the number of hours of work performed by Distributor.

5.       ☐ A   ☐ N A

Distributor recognizes that Publisher maintains contracts with other publishers regarding the distribution of their publications and that Publisher does not own such publications (collectively "Non-owned Publications").   The Non-owned Publications, and the fee payable for the delivery of each such publication, are listed on the Schedule of Non-owned Publications which is attached hereto and incorporated herein by this reference.   Publisher will from time to time designate Non-owned Publications for delivery on Distributor's Route(s) and Publisher agrees to pay Distributor the applicable delivery fee, indicated on the Schedule of Non-owned Publications, for each copy of the applicable Non-owned Publication which Distributor delivers on the Route(s).   Distributor agrees to begin delivering any such designated Non-owned Publications on the Route(s) immediately upon notification from Publisher that the Non-owned Publication has been designated for delivery on the Route(s). All Non-owed Publications received by Distributor pursuant to this Paragraph 5 are not and shall not be the property of Distributor and Distributor shall have no

2

ownership interest in those publications. Accordingly, Distributor shall have no risk of loss regarding such Non-owned Publications and shall have no credit risks respecting payments by customers for Non-owned Publications, if any. However, nothing herein shall limit Distributor's liability to Publisher for the value of Non-owned Publications which are damaged, destroyed, stolen or lost after receipt of such Non-owned Publications from Publisher and prior to delivery by Distributor. Distributor agrees that Distributor will not set the price, if any, of Non-owned Publications delivered pursuant to this Paragraph 5 and that Distributor will not charge customers or anyone other than Publisher for the delivery of publications pursuant to this Paragraph 5. Publisher shall have the right to modify the fees in the Schedule of Non-owned Publications, any such change being effective upon thirty (30) days advance written notice to Distributor. The parties agree that Distributor's remuneration under this Paragraph 5 is directly related to Distributor's output rather than the number of hours of work performed by Distributor.

      6.    ☐ A  ☐ N/A

Distributor acknowledges receipt from Publisher of a list of locations where bundles of newspapers ("Newspaper Bundles") are to be dropped ("Drop Locations"). Distributor agrees to deliver all Newspaper Bundles to Drop Locations according to the terms of this Agreement. All newspapers in Newspaper Bundles are and shall remain the exclusive property of Publisher and at no time shall Distributor have title to those newspapers or Newspaper Bundles. However, nothing herein shall limit Distributor's liability to Publisher for copies of newspapers and/or for Newspaper Bundles, damaged, destroyed, stolen or lost after receipt of same by Distributor and before delivery to Drop Locations. Distributor shall not impose any charge for delivery or other services related to the distribution of Newspaper Bundles apart from the fees indicated in this paragraph which are payable from Publisher to Distributor.

                $ _, 5000_ per delivery to a Drop Location when there are between _____ and _____ Drop Locations on the Route.

      6A.    DISTRIBUTOR agrees to purchase said newspapers for distribution in newspaper racks from PUBLISHER at the wholesale rates of _N/a_ per daily and _N/a_ per Sunday copy. It is agreed that DISTRIBUTOR will furnish locks for said newspaper racks located within their APR.

Publisher shall have the right to modify the fee(s) set forth above, any such change being effective upon thirty (30) days advance written notice to Distributor. The parties agree that Distributor's remuneration under this Paragraph 6 is directly related to Distributor's output rather than the number of hours of work performed by Distributor. Distributor shall also pick up and deliver to Publisher unsold newspapers being returned to Publisher by single copy distributors.

      7.    Distributor will provide, at his/her own expense, a substitute of Distributor's choice capable of performing the obligations of Distributor hereunder in the event of Distributor's illness, disability or absence, or if for any other reason Distributor is unable to perform his/her responsibilities under this Agreement. Additionally, Distributor agrees not to assign this Agreement or any right or obligation arising hereunder, without the prior written consent of Publisher.

8.      Distributor warrants that he she operates an independent business enterprise. Distributor exercising sole and exclusive control over the manner and means employed by Distributor in operating his her business.  Consequently, Distributor is and shall remain an independent contractor, solely responsible for (1) obtaining and maintaining vehicles used to perform delivery services; (2) paying all expenses incurred in providing delivery services; (3) selecting and controlling the means, facilities, tools and equipment used to perform delivery services; (4) hiring, compensating, controlling and discharging persons utilized by him her to provide delivery services; and (5) satisfying all obligations concerning applicable taxes to (a) Federal; (b) State; (c) County; and (d) City Government.  In particular, and without limiting the foregoing, Publisher will not treat Distributor as an employee for Federal tax purposes.

Further, Distributor acknowledges that he she has neither paid nor agreed to pay anything of value for the rights and obligations conferred upon Distributor hereunder, and that the sole and only consideration given by either party is set forth within this Agreement.

9.      As an independent contractor Distributor is not acting for or on behalf of or as an agent of Publisher and shall have no power, right, or authority to bind Publisher in any manner whatsoever.   All persons retained by Distributor to perform his her obligations under this Agreement shall be subject solely to Distributor's control and are selected exclusively by Distributor at his her sole liability and expense.

10.      Distributor acknowledges receipt from Publisher of a list containing the locations of all customers on Distributor's Routes.  Distributor agrees that these records are the sole property of Publisher and that those records shall be delivered to Publisher at any time upon demand and in the event of the termination of this Agreement for any reason.  Distributor further agrees that the list shall not be transferred or exhibited to any other person or firm; provided however, Distributor may exhibit the list to any of Distributor's employees or agents that require the information therein to accomplish deliveries under this Agreement.   Distributor acknowledges that he she shall not acquire, by this Agreement or otherwise, any proprietary interest or any other property right or interest in Distributor's Routes or in the list furnished Distributor by Publisher.  Distributor agrees to convey all "new start" requests to Publisher.  Distributor also acknowledges receipt from Publisher of certain property of Publisher, including single-copy keys, locks, apartment keys, slugs and entry codes, and agrees that this property of Publisher shall be delivered to Publisher at any time upon demand and in the event of the termination of this Agreement for any reason.

11.      In order that Publisher may comply with the requirements and regulations of the Audit Bureau of Circulations in its audit of the nature and extent of the distribution and circulation of Publisher's newspapers, and in order that Publisher may make accurate reports of its circulation as required by the Postal Laws and Regulations of the United States, Distributor agrees to furnish from time to time, upon request by Publisher, and not later than five (5) days after such request, an accurate list of his her customers regularly purchasing and or receiving Publisher's publications as a customer of Distributor and all collection records for said customers.  Further, in the event of the termination of this Agreement for any reason, Distributor agrees to return the Route list and collection records to Publisher immediately.

12.      Publisher shall have no liability for any loss, damage or expense incurred or caused by Distributor in the performance of this Agreement.  Distributor agrees to defend, indemnify, and

4

hold Publisher harmless from any and all liabilities, claims, demands, suits, costs, charges, and expenses including, but without limiting the foregoing, attorneys' fees incident to any claim, loss, damage, or injury to the person or property of Distributor or to the person or property of anyone injured through the acts or omissions of Distributor or Distributor's agents, employees, or other persons acting on Distributor's behalf. Distributor shall carry liability insurance on all vehicles which may be operated in the performance of this Agreement and general liability insurance covering all operations and premises, from a company of Distributor's choice, for the duration of this Agreement. Distributor agrees to provide certificates of insurance to Publisher as evidence of such coverage, and proof of a valid and current driver's license. In addition, Distributor agrees that he/she will carry workers' compensation insurance for his/her employees, if any, in accordance with applicable state law. The foregoing indemnification obligation of Distributor in this paragraph shall survive the termination of this Agreement, until the expiration of any time period established by law for bringing claims, demands, or legal proceedings with respect to which indemnification may be claimed under this paragraph. Moreover, for the duration of this Agreement, Distributor agrees to maintain on-route accident insurance coverage for Distributor and Distributor's substitute(s) while they are performing services under this Agreement. Distributor may either (i) elect to be covered under the on-route accident insurance policy offered to Distributor by a third party company, which is made available through Publisher or (ii) elect to procure and maintain equivalent on-route accident insurance coverage from a third party company of Distributor's choice. Distributor shall indicate which of these two options Distributor has selected by marking the applicable box below:

(i)  ☐  Distributor elects to be covered by the on-route accident insurance policy made available through Publisher.

(ii)  ☐  Distributor elects to procure and maintain equivalent on-route accident insurance coverage from a third party company.

In the event that Distributor elects option (ii) above, Distributor will provide Publisher with certificates of insurance evidencing that such insurance coverage has been procured and will be maintained by Distributor for the duration of this Agreement. Distributor agrees to furnish at its expense all required business licenses or registrations.

13.   Within thirty (30) days of the termination of this Agreement by either party, Distributor will transfer to Publisher all monies that Distributor has received in advance from customers on his/her Routes for future sale and delivery of Publisher's publications, to the extent that Distributor has not yet fulfilled his obligations to those customers for future prepaid deliveries. Publisher shall hold said prepayments in trust for the respective customers of Distributor until such time as a new distributor shall contract to assume the Routes, at which time Publisher shall transfer said prepayments to the new distributor. This provision is for the benefit of both the respective customers on Distributor's Routes and the new distributor who will fulfill the future delivery obligations represented by such prepaid amounts, and under no circumstances shall any such prepayments become the funds or property of Publisher.

14.   Distributor may engage in any other business or employment, including the delivery or sale of other publications or products, so long as it does not interfere or conflict with the performance of Distributor's obligations under this Agreement; provided, however, Distributor shall not stamp upon, attach to, or insert in copies of the newspapers and/or publications received from

Publisher any advertising matter not furnished by Publisher nor shall Distributor insert such newspapers and/or publications within any imprinted wrapping, covering, or container not furnished by Publisher.

15.     Distributor shall not use any trademarks, trade names, slogans, or logos owned by Publisher without Publisher's prior written consent.  In particular, but without limitation of the generality of the foregoing, Distributor may not display the name of any of Publisher's newspapers on any vehicle owned or used by Distributor.

16.   In the event that a customer on Distributor's Route(s) registers or makes a service complaint with Publisher relating to delivery of the customer's newspaper, Distributor agrees to pay Publisher the applicable fee described below for each such occurrence, to compensate Publisher for Publisher's costs and expenses associated with rectifying such complaint.  In that regard, Distributor will be charged a fee of $2 for each complaint by a customer of a missed delivery.  Distributor will be charged a fee of $4 for each complaint by a customer for any of the following:  late delivery, incomplete newspaper, torn or damaged newspaper, newspaper not tubed or wrong placement of newspaper, wet newspaper, wrong newspaper or issue delivered and/or failure to deliver any non-daily publication or supplemental product provided by Publisher.  Moreover, in the event that a representative of Publisher delivers a newspaper to a customer on Distributor's Route(s) in response to a service complaint received by Publisher, Distributor agrees to pay to Publisher a delivery charge of $2 , in addition to the foregoing fee(s), to compensate Publisher for Publisher's costs and expenses associated with making such delivery.  Distributor recognizes that starting delivery to new customers and administering customer vacation requests to the satisfaction of customers are both important results Distributor is to achieve under this Agreement.  In the event that Distributor fails to start delivery as requested by a customer or fails to administer vacation requests as requested by a customer, Distributor agrees to pay Publisher a fee of $5 for each such occurrence, to compensate Publisher for Publisher's costs and expenses associated with such failure.  Moreover, should Distributor default in the performance of this Agreement in any particular, Publisher may forthwith, and without notice, make other arrangements to effect delivery of the newspapers to subscribers on the Route(s), and all costs or expenses incurred in making such deliveries shall be deducted by Publisher from Distributor's compensation and/or from the bond or deposit established under Paragraph 19 herein.

17.     The following are Distributor's Minimum Performance Standards in effect as of the execution of this Agreement:

Customer Complaints: No more than  1.5 complaint(s) per thousand newspapers delivered.

In the event Distributor fails to meet the Minimum Performance Standards as set forth above, Publisher will notify Distributor of such failure and will provide Distributor an opportunity within seven (7) days to correct the notified deficiencies.  In the event Distributor fails to correct the notified deficiencies, Publisher may immediately terminate this Agreement.  Publisher may adjust the above minimum standards or add additional minimum standards upon at least thirty (30) days advance written notice to Distributor.

18.     It is mutually recognized that customer satisfaction is an essential element of this Agreement. It is further recognized that Distributor's failure to deliver his/her Route(s), or failure to

6

provide adequate notice of his/her intent to terminate this Agreement as required by Paragraph 20(a) below, would significantly impair Publisher's ability to ensure delivery of its publications to its customers, and that Publisher's damages in this respect are difficult to calculate precisely.  It is therefore agreed that in the event Distributor fails to deliver his/her Route(s), or ceases to perform delivery services under this Agreement without first complying with the requirements of Paragraph 20(a), Publisher may charge Distributor, as liquidated damages, an amount of _____ for each and every day that Distributor is in default of his/her delivery obligations, up to a maximum of thirty (30) days, which amount is a reasonable estimate of Publisher's damages.  These liquidated damages may be charged against and deducted from Distributor's security bond or security deposit as established under Paragraph 19 herein.  Further, in the event that the security bond or security deposit is not sufficient to satisfy the amount of liquidated damages due to Publisher from Distributor hereunder, Publisher may pursue payment of such additional amounts which are due and payable through any and all available legal action.

19.    ☐ A  ☐ N A

Distributor agrees to secure payment of all sums that may become due and payable by Distributor to Publisher under the terms of this Agreement, in one of the following two ways:

(a)    DISTRIBUTOR will obtain a security bond in the amount of $ 500 00 from a company of DISTRIBUTOR's choice, licensed to do business in the State of Arkansas.

(b)    DISTRIBUTOR agrees to pay a non-refundable Bond Insurance to PUBLISHER with a company of PUBLISHER's choosing. For Bond Insurance in the amount of $ 500 00, the amount of $ 1.75 will be charged to DISTRIBUTOR's account each billing period. PUBLISHER will not be responsible for any error in rates or charges beyond sixty (60) days.

Publisher shall not be limited to such security for any damage caused by or amounts due from Distributor.

20.    Unless terminated in a manner prescribed below, this Agreement shall continue in full force and effect as stated in Paragraph 22 herein.  Moreover:

(a)    Either party may terminate this Agreement, with or without cause, upon at least thirty (30) days advance written notice to the other party.

(b)    Publisher may terminate this Agreement without prior notice upon Distributor's falsification of any report submitted to Publisher, commission of any wrongful act resulting in loss, damage or injury to Publisher, or any failure to satisfy the Minimum Performance Standards under Paragraph 17, and either party may terminate this Agreement without prior notice upon any breach of the terms of this Agreement by the other party.

(c)    Publisher may terminate this Agreement or suspend its performance hereunder without prior notice in the event Publisher's facilities are damaged or destroyed or Publisher's

7

performance hereunder is prevented or hindered by labor disturbances, including but not limited to strikes and picketing, or by acts of God, the elements, order of government, civil or military authority, or any other cause (whether similar or dissimilar to the above mentioned) not within the reasonable control of Publisher. Additionally, Publisher's obligations hereunder are expressly conditioned upon publication. In the event Publisher terminates publication of any of its newspapers or ceases to publish any editions thereof, this Agreement may be terminated by Publisher in its entirety during the period of time there is no publication or may be terminated ratably, to the extent of any cessation of publication of any edition thereof.

21.     This Agreement, including the Schedules attached hereto, is intended as the final, complete and exclusive statement of the terms of the parties' agreement. This Agreement cannot be modified in any respect except in writing signed by Distributor and Publisher's Circulation Manager. Publisher does not waive any contractual provision herein by failing to enforce it. Additionally, the parties agree that this Agreement, including the Schedules attached hereto, shall supersede all previous contracts or agreements, whether written or oral, between Publisher and Distributor.

22.     Subject to being earlier terminated as provided in paragraph 20 of this Agreement, the initial term of the Agreement shall commence on _Sept. 4_, 2020 and shall continue for an initial one (1) year period thereafter. The Agreement will subsequently automatically renew for successive periods of one (1) year each unless either party gives advance written notice to the other party of that party's decision not to renew the Agreement at least thirty (30) days prior to the end of the then current term, in which event the Agreement will terminate at the end of the then current term.

_____      _____9/4/20_____
Distributor Signature                  Date

_____
Print Name

_____
Phone No.

_____      _____9/4/20_____
Representative of Paxton Media Group   Date

THIS CONTRACT AND AGREEMENT NOT BINDING ON PAXTON MEDIA GROUP
UNLESS SIGNED BY ITS CIRCULATION MANAGER
OR HOME DELIVERY MANAGER

By: _____
    CIRCULATION MANAGER HOME DELIVERY MANAGER

8

## INDEPENDENT CONTRACTOR DISTRIBUTOR AGREEMENT
### Paxton Media Group
(Bundle Delivery)

PAXTON MEDIA GROUP, ("PUBLISHER"), and $\underline{Shaunde\ Smith}$ ("DISTRIBUTOR"), have entered into the following contract and agreement ("Agreement"), in consideration of their mutual promises and agreements.

WHEREAS, PUBLISHER may from time to time require the services of an independent business enterprise to deliver the newspaper it publishes; and

WHEREAS, DISTRIBUTOR warrants that he/she operates an independent business enterprise which is capable of providing, and desires to provide, the aforementioned services to PUBLISHER;

NOW, THEREFORE, for and in consideration of the mutual promises, warranties and undertakings of the parties, it is agreed as follows:

1. .   DISTRIBUTOR shall be primarily responsible for the distribution of newspapers for, Jonesboro Sun & Paragould Daily Press to the following towns and/or areas:



this being DISTRIBUTOR's Area of Primary Responsibility ("APR").   PUBLISHER reserves the right to modify the boundaries of DISTRIBUTOR'S APR upon at least thirty (14) days advance written notice to DISTRIBUTOR.

2.   DISTRIBUTOR acknowledges receipt from PUBLISHER of a list of locations where bundles of newspapers ("Newspaper Bundles") are to be dropped ("Drop Locations") and DISTRIBUTOR acknowledges that he/she shall not acquire, by this Agreement or otherwise, any proprietary interest or any other property right or interest in the APR or the list of bundle Drop Locations furnished DISTRIBUTOR by PUBLISHER.

3.   DISTRIBUTOR agrees to deliver all Newspaper Bundles to Drop Locations according to the terms of this Agreement.   All newspapers in Newspaper Bundles are and shall remain the exclusive property of PUBLISHER and at no time shall DISTRIBUTOR have title to those newspapers. However, nothing herein shall limit DISTRIBUTOR'S liability to PUBLISHER for copies of newspapers and/or for Newspaper Bundles, damaged, destroyed, stolen or lost after receipt of same by DISTRIBUTOR and before delivery to Drop Locations. DISTRIBUTOR not impose any charge for delivery or other services related to the distribution of newspapers or Newspaper Bundles apart from the fees indicated in this paragraph which are payable from PUBLISHER to DISTRIBUTOR.

1

**EXHIBIT**

tabbies

$\underline{D}$

S __10''__ per delivery to a Drop Location when there are between __1__ and __15__ Drop Locations in the APR.

PUBLISHER shall have the right to modify the fee(s) set forth above, any such change being effective upon thirty (30) days advance written notice to DISTRIBUTOR. The parties agree that DISTRIBUTOR'S remuneration under this paragraph 3 is directly related to DISTRIBUTOR'S output rather than the number of hours of work performed by DISTRIBUTOR.

4.    DISTRIBUTOR shall also pick up and deliver to PUBLISHER unsold newspapers being returned to PUBLISHER by single copy distributors. DISTRIBUTOR shall be responsible for delivering all such returned newspapers according to the Annual Return Schedule. The Annual Return Schedule is a part of this Agreement and is incorporated by reference herein.

5.    DISTRIBUTOR agrees to furnish at DISTRIBUTOR'S expense all required business licenses or registrations, and public liability and property damage insurance with a company of DISTRIBUTOR'S choice. DISTRIBUTOR further agrees to furnish PUBLISHER with certificates establishing that such insurance is in force and effect, that the premiums have been paid, and that the same will not be amended, cancelled, terminated or revoked without ten (10) days advance written notice to PUBLISHER.

6.    DISTRIBUTOR warrants that he/she operates an independent business enterprise, DISTRIBUTOR exercising sole and exclusive control over the manner and means employed by DISTRIBUTOR in operating his/her business. Consequently, DISTRIBUTOR is and shall remain an independent contractor, solely responsible for (1) obtaining and maintaining vehicles used to perform delivery services; (2) paying all expenses incurred in providing delivery services; (3) selecting and controlling the means and facilities used to perform delivery services; (4) hiring, compensating, directing and discharging persons utilized by him/her to provide delivery services; and (5) satisfying all obligations concerning applicable taxes to (a) Federal; (b) State; (c) County; and (d) City Government. In particular, and without limiting the foregoing, PUBLISHER will not treat DISTRIBUTOR as an employee for Federal tax purposes with respect to the services provided by DISTRIBUTOR pursuant to this Agreement.

7.    DISTRIBUTOR shall not assign this Agreement, or any part hereof, without the prior written consent of PUBLISHER.

8.    DISTRIBUTOR may engage in any other business or employment, including the delivery or sale of other publications or products, so long as it does not interfere or conflict with the performance of DISTRIBUTOR's obligations under this Agreement; provided, however, DISTRIBUTOR shall not stamp upon, attach to, or insert in copies of the newspapers or Newspaper Bundles received from PUBLISHER any advertising matter not furnished by PUBLISHER nor shall DISTRIBUTOR insert such newspapers, or Newspaper Bundles within any imprinted wrapping, covering, or container not furnished by PUBLISHER.

9.    DISTRIBUTOR shall not use any trademarks, trade names, slogans, or logos owned by PUBLISHER without PUBLISHER'S prior written consent. In particular, but without limiting the foregoing, DISTRIBUTOR may not display the term *Jonesboro Sun* on any vehicle owned or used by DISTRIBUTOR.

2

10.    DISTRIBUTOR agrees to defend, indemnify, and hold PUBLISHER harmless from any and all liabilities, claims, demands, suits, costs, charges, and expenses including, but without limiting the foregoing, attorneys' fees incident to any claim, loss, damage, or injury to the person or property of DISTRIBUTOR or to the person or property of anyone injured through the acts or omissions of DISTRIBUTOR or DISTRIBUTOR's agents, employees, or other persons acting on DISTRIBUTOR'S behalf.  DISTRIBUTOR shall carry sufficient liability insurance to reasonably assure DISTRIBUTOR'S ability to satisfy the indemnity obligation arising hereunder, including public liability and property damage insurance maintained at his or her own expense on all vehicles which may be operated in the performance of this Agreement.  In addition, DISTRIBUTOR agrees that he/she will carry workers' compensation insurance for his/her employees, if any, in accordance with the laws of the State of Arkansas.   The foregoing indemnification obligation of DISTRIBUTOR in this paragraph shall survive the termination of this Agreement, until the expiration of any time period established by law for bringing claims, demands, or legal proceedings with repsect to which indemnification may be claimed under this paragraph.

11.    DISTRIBUTOR will provide, at his/her own expense, a substitute of DISTRIBUTOR'S choice capable of performing the obligations of DISTRIBUTOR hereunder in the event of DISTRIBUTOR'S illness, disability or absence, or if for any other reason DISTRIBUTOR is unable to perform his/her responsibilities under this Agreement.

12.    As an independent contractor, DISITRIBUTOR is not acting for or on behalf of or as an agent of PUBLISHER and shall have no power, right or authority to bind PUBLISHER in any manner whatsoever.  All persons retained by DISTRIBUTOR to perform his/her obligations under this Agreement shall be subject solely to DISTRIBUTOR'S control and are selected exclusively by DISTRIBUTOR at his/her sole liability and expense.

13.    Unless terminated in a manner prescribed below, this Agreement shall continue in full force and effect as stated at paragraph 15 herein.  Moreover:

(a)    Either party may terminate this Agreement, with or without cause, upon thirty (30) days advance written notice.

(b)    PUBLISHER may terminate this Agreement without prior notice upon DISTRIBUTOR'S falsification of any report submitted to PUBLISHER, commission of any wrongful act resulting in loss, damage or injury to PUBLISHER, or any breach of the terms of this Agreement.

(c)    PUBLISHER may terminate this Agreement or suspend its performance hereunder without prior notice in the event PUBLISHER'S facilities are damaged or destroyed or PUBLISHER'S performance hereunder is prevented or hindered by labor disturbances, including but not limited to strikes and picketing, or by acts of God, the elements, order of government, civil or military authority, or any other cause (whether similar or dissimilar to the above mentioned) not within the reasonable control of PUBLISHER.

3

(d)     It is mutually recognized that customer satisfaction is an essential element of this Agreement. It is further recognized that DISTRIBUTOR's failure to deliver his/her route, or failure to provide adequate notice of his/her intent to terminate this Agreement, as required by paragraph 13(a) above, would significantly impair PUBLISHER's ability to ensure delivery of its publication(s) to its customers, and that PUBLISHER's damages in this respect are difficult to calculate precisely. It is therefore agreed that in the event DISTRIBUTOR fails to deliver his/her APR, or ceases to perform delivery services under this Agreement without first complying with the requirements of paragraph 13, PUBLISHER may charge DISTRIBUTOR an amount of $ 60      for each and every day that Carrier is in default of his/her delivery obligations, up to a maximum of 30 days, which amount is a reasonable estimate of PUBLISHER's damages.

14.     This Agreement is intended as the final, complete and exclusive statement of the terms of the parties' agreement. This Agreement cannot be modified in any respect except in writing signed by DISTRIBUTOR and PUBLISHER'S Circulation Manager. PUBLISHER does not waive any contractual provision herein by failing to enforce it. Additionally, the parties agree that this Agreement shall supersede all previous contracts or agreements, whether written or oral, between PUBLISHER and DISTRIBUTOR.

15.     This Agreement shall remain in effect for the following period, subject to the qualifications found in paragraph 14, beginning ___Jan. 16___, 20 20 and ending ___Jan. 16___, 20 21.

___1-21-20___
DATE

___Shawnda Clyutt___
DISTRIBUTOR

___11/6/20___
DATE

___Lesli Pennin___
REPRESENTATIVE OF THE PAXTON MEDIA GROUP

THIS CONTRACT AND AGREEMENT NOT BINDING ON
PAXTON MEDIA GROUP
UNLESS SIGNED BY THE CIRCULATION DIRECTOR
FOR THE JONESBORO SUN

By: _____
CIRCULATION DIRECTOR

4

## INDEPENDENT CONTRACTOR DISTRIBUTOR AGREEMENT
(Per Piece)

— PAXTON MEDIA GROUP, ("PUBLISHER"), and _Shaundi Smith_ of _Jonesboro, Arkasas_, ("DISTRIBUTOR"), have entered into the following contract and agreement ("Agreement"), in consideration of their mutual promises and agreements.

WHEREAS, PUBLISHER may from time to time require the services of an independent business enterprise to deliver the newspaper it publishes; and

WHEREAS, DISTRIBUTOR warrants that he/she operates an independent business enterprise which is capable of providing, and desires to provide, the aforementioned services to PUBLISHER;

NOW, THEREFORE, for and in consideration of the mutual promises, warranties and undertakings of the parties, it is agreed as follows:

1.      PUBLISHER agrees to supply DISTRIBUTOR with as many copies of PUBLISHER's newspapers as DISTRIBUTOR shall require fulfilling the obligations created by this Agreement. All products delivered pursuant to this Agreement are and shall remain the exclusive property of the PUBLISHER.  Accordingly, all risks of loss regarding such products and all credit risks respecting payments by customers shall remain with the PUBLISHER; provided, however, that nothing herein shall affect DISTRIBUTOR's liability to PUBLISHER for any negligent or wrongful act prior to delivery of newspapers by DISTRIBUTOR. DISTRIBUTOR agrees that DISTRIBUTOR will not set the price of newspapers delivered and that DISTRIBUTOR shall not charge customers or anyone other than PUBLISHER for the delivery of newspapers pursuant to this paragraph. The parties specifically agree that DISTRIBUTOR will deliver said newspapers received from the PUBLISHER as soon as practicable after delivery of said newspapers from PUBLISHER to DISTRIBUTOR.

2.      DISTRIBUTOR shall be primarily responsible for the satisfactory delivery of *The Jonesboro Sun* in the territory known as subscription delivery route ___74___, this being DISTRIBUTOR's Area of Primary Responsibility ("APR").  PUBLISHER reserves the right to modify the boundaries of DISTRIBUTOR's APR upon at least fourteen (14) days advance written notice to DISTRIBUTOR.

3.      PUBLISHER agrees to pay DISTRIBUTOR the following fees for home delivery of *The Jonesboro Sun*:

_.2100_   per Daily and Sunday copy
_.2884_   per Friday/Saturday/Sunday (Weekend) copy
_.3803_   per Sunday/Monday copy
_.2100_   per Saturday/Sunday/Monday copy
_.4200_   per Sunday only copy

3A.     In the event DISTRIBUTOR is responsible for delivering newspapers to PUBLISHER's (company) news racks, news dealers or bulk/hotel accounts in DISTRIBUTOR's APR, PUBLISHER will compensate DISTRIBUTOR for those deliveries in the following manner:

$ _N/A_   per company news rack per day.

$ _N/A_   per company news dealer/ bulk / hotel account per day.

**EXHIBIT**
**E**

DISTRIBUTOR shall be responsible for the basic appearance, cleanliness and maintenance of all news racks, vending machines and wire racks located on DISTRIBUTOR's APR. In order for PUBLISHER to properly bill distribution accounts DISTRIBUTOR agrees that all return sheets will be turned in at least once per week.

3B.    DISTRIBUTOR agrees to purchase said newspapers for distribution in newspaper racks from PUBLISHER at the wholesale rates of _N/A_ per daily and _N/A_ per Sunday copy. It is agreed that DISTRIBUTOR will furnish locks for said newspaper racks located within their APR. It is agreed that PUBLISHER from time to time shall have the right to modify the wholesale rate price or rate for newspapers sold to DISTRIBUTOR under this AGREEMENT, said modification to wholesale rate being effective fourteen (14) days after notice of rate change to DISTRIBUTOR.

4.    DISTRIBUTOR, as an independent contractor, agrees to deliver all publications other than *The Jonesboro Sun* furnished by PUBLISHER for distribution in DISTRIBUTOR's APR. PUBLISHER agrees to pay DISTRIBUTOR for such deliveries in the following manner:

PUBLICATION

NEA Shoppers delivered to homes          .08    cents per publication delivered

NIE Bundles, Shopper bundles          .75    cents per site delivered

Misc. Advertising          .03    cents per publication delivered

Requested Samples by The Sun          .05    cents per publication delivered

5.    DISTRIBUTOR agrees to furnish at its expense all required business licenses or registrations, and public liability and property damage insurance with a company of DISTRIBUTOR's choice. DISTRIBUTOR further agrees to furnish PUBLISHER with certificates establishing that such insurance is in force and effect, that the premiums have been paid, and that the same will not be amended, cancelled, terminated or revoked without ten (10) days prior notice to PUBLISHER. DISTRIBUTOR warrants that he/she operates an independent business enterprise, DISTRIBUTOR exercising sole and exclusive control over the manner and means employed by DISTRIBUTOR in operating his/her business.   Consequently, DISTRIBUTOR is and shall remain an independent contractor, solely responsible for (1) obtaining and maintaining vehicles used to perform delivery services; (2) paying all expenses incurred in providing delivery services; (3) selecting and controlling the means and facilities used to perform delivery services; (4) hiring, compensating, controlling and discharging persons utilized by him/her to provide delivery services; and (5) satisfying all obligations concerning applicable taxes to (a) Federal; (b) State; (c) County; and (d) City Government. In particular, and without limiting the foregoing. PUBLISHER will not treat DISTRIBUTOR as an employee for federal tax purposes.

6.    The parties agree that effective as of the date DISTRIBUTOR signs the Agreement (the "Effective Date"), all payments to DISTRIBUTOR from PUBLISHER pursuant to the Agreement shall be made via electronic transfer of funds ("EFT") to either the bank account of DISTRIBUTOR ("Direct Deposit") or to a debit card which can be provided to DISTRIBUTOR ("Debit Card"). The Direct Deposit arrangement shall be subject to and governed by the terms and conditions of the financial institution and/or entity which provides that Direct Deposit arrangement and the Debit Card shall be subject to and governed by the terms and conditions of the financial institution and/or entity which provides that Debit Card.



DISTRIBUTOR selects the following option for EFT payments to DISTRIBUTOR by marking the applicable line below:

_____ Direct Deposit (If this option is selected, complete the Electronic Funds Transfer Authorization Form and provide to PUBLISHER)

___✓___ Debit Card (If this option is selected, complete the FOCUS CARD Enrollment Form, Electronic Funds Transfer Authorization Form and prove to PUBLISHER)

DISTRIBUTOR must select one of the two options above, complete the applicable Authorization Form and provide the Authorization Form to PUBLISHER. On or before the Effective Date, DISTRIBUTOR shall take all necessary actions and shall provide all required information so that PUBLISHER will be able to make payments to DISTRIBUTOR via either the Direct Deposit or Debit Card option selected by DISTRIBUTOR above. The parties specifically agree that as of the Effective Date, EFT shall be the sole method of payment to DISTRIBUTOR and no physical payments, including checks, shall be made to DISTRIBUTOR by PUBLISHER.

7.      DISTRIBUTOR agrees that the records of subscribers on said route are the sole property of PUBLISHER and that said records shall be delivered to PUBLISHER at any time upon demand and in the event of termination of this Agreement for any reason. DISTRIBUTOR agrees that the route list shall not be transferred or exhibited to any other person or firm; however, DISTRIBUTOR may exhibit the list to any of DISTRIBUTOR's employees or agents that require the information therein to deliver PUBLISHER'S newspapers. DISTRIBUTOR acknowledges that he or she shall not acquire, by this Agreement or otherwise, any proprietary interest or any other property right or interest in DISTRIBUTOR's APR or in the route list furnished DISTRIBUTOR by PUBLISHER, and that the sole and only consideration given by either party is set forth within this document. In order that PUBLISHER may comply with the requirements and regulations of an independent audit firm in its audit of the nature and extent of the distribution and circulation of *The Jonesboro Sun*, and in order that PUBLISHER may make accurate reports of its circulation as required by the Postal Laws and Regulations of the United States, DISTRIBUTOR agrees to furnish from time to time, upon request by PUBLISHER, and not later than five (5) days after such request, an accurate throw list or tape recording identifying the delivery location for customers regularly purchasing and receiving *The Jonesboro Sun* as a customer of DISTRIBUTOR.

8.      DISTRIBUTOR, upon receiving delivery and title to said newspapers, shall bear the risk of loss regarding damaged, destroyed, stolen, lost or unsold newspapers (subject to qualifications contained in paragraph 19 of this Agreement). DISTRIBUTOR is an independent contractor and is not acting for or on behalf of or as an agent of PUBLISHER and shall have no power, right, or authority to bind PUBLISHER in any manner whatsoever, the sole purpose of this Agreement, insofar as PUBLISHER is concerned, being to provide for the sale of its newspapers for resale and distribution to ultimate consumers, the readers. All persons retained by DISTRIBUTOR to perform his/her obligations under this Agreement shall be subject solely to DISTRIBUTOR's control and are selected exclusively by DISTRIBUTOR at his/her sole liability and expense.

9.      The following are DISTRIBUTOR's minimum performance standards in effect as of the execution of this Agreement:

Customer Complaints: No more than 1.50 complaints per thousand newspapers delivered.

In the event DISTRIBUTOR fails to meet the minimum performance standards as set forth above, PUBLISHER will notify DISTRIBUTOR of such failure and will provide DISTRIBUTOR an opportunity within fourteen (14) days to correct the notified deficiencies. In the event DISTRIBUTOR fails to correct the notified deficiencies, PUBLISHER may immediately terminate this Agreement.

10.     DISTRIBUTOR shall not assign this Agreement or any part thereof, without the prior written consent of PUBLISHER. DISTRIBUTOR will provide, at his her own expense, a substitute of DISTRIBUTOR's choice capable of performing the obligations of DISTRIBUTOR hereunder in the event of DISTRIBUTOR's illness, disability, absence, or for any other reason DISTRIBUTOR is unable to perform his her responsibilities. DISTRIBUTOR is responsible for all charges incurred by his her substitute.

11.     DISTRIBUTOR may engage in any other business or employment, including the delivery or sale of other publications or products, so long as it does not interfere or conflict with the performance of DISTRIBUTOR's obligations under this Agreement; provided, however, DISTRIBUTOR shall not stamp upon, attach to, or insert in copies of the newspapers purchased from PUBLISHER any advertising matter not furnished by PUBLISHER nor shall DISTRIBUTOR insert such newspapers within any imprinted wrapping, covering, or container not furnished by PUBLISHER.

12.     DISTRIBUTOR shall not use any trademarks, trade names, slogans, or logos owned by PUBLISHER without PUBLISHER's prior written consent. In particular, but without limitation of the generality of the foregoing, DISTRIBUTOR may not display the term *The Jonesboro Sun, Jonesboro Sun* or *The Sun* on any vehicle owned or used by DISTRIBUTOR.

13.     DISTRIBUTOR agrees to defend, indemnify, and hold PUBLISHER harmless from any and all liabilities, claims, demands, suits, costs, charges, and expenses including, but without limiting the foregoing, attorneys' fees incident to any claim, loss, damage, or injury to the person or property of DISTRIBUTOR or to the person or property of anyone injured through the acts or omissions of DISTRIBUTOR or DISTRIBUTOR's agents, employees, or other persons acting on DISTRIBUTOR's behalf. DISTRIBUTOR shall carry sufficient liability insurance to reasonably assure DISTRIBUTOR's ability to satisfy the indemnity obligation arising hereunder, including public liability and property damage insurance maintained at his or her own expense on all vehicles which may be operated in the performance of this Agreement. In addition, DISTRIBUTOR agrees that he she will carry workers' compensation insurance for his her employees, if any, in accordance with the laws of the State of Arkansas.

14.     Subscriber satisfaction is of paramount importance to PUBLISHER so that, although PUBLISHER is under no obligation to do so, PUBLISHER may, at its sole option, make deliveries of newspapers in response to customer service complaints in DISTRIBUTOR's APR. PUBLISHER's exercise of this option shall not be deemed to waive or excuse DISTRIBUTOR's agreement to distribute in a manner satisfactory to the subscriber. DISTRIBUTOR agrees to reimburse PUBLISHER the sum of $2.00 for PUBLISHER's expenses in receiving and processing customer complaints. In the event that PUBLISHER furnishes a replacement copy for the subscriber, DISTRIBUTOR will reimburse PUBLISHER up to an additional $2.00. Vacation requests are of the utmost importance to the subscriber; to that end, PUBLISHER has the right to charge the sum of $5.00 for failure by DISTRIBUTOR to stop restart a subscriber as notified, or deliver papers held for redelivery (Vacation pack).

15.     DISTRIBUTOR agrees to secure his her performance under this Agreement, in one of the following two ways:

(a)     DISTRIBUTOR will obtain a security bond in the amount of $ _1500 60_ from a company of DISTRIBUTOR's choice, licensed to do business in the State of Arkansas.

(b)     DISTRIBUTOR agrees to pay a non-refundable Bond Insurance to PUBLISHER with a company of PUBLISHER's choosing. For Bond Insurance in the amount of $ _3.75_ , the amount of $ _1500_ will be charged to DISTRIBUTOR's account each billing period. PUBLISHER will not be responsible for any error in rates or charges beyond sixty (60) days.

It is specifically agreed that PUBLISHER is authorized to deduct and retain from said bond any and all amounts sufficient to cover any indebtedness by DISTRIBUTOR to PUBLISHER under this Agreement and any damages sustained by PUBLISHER on that account, including but not limited to any amounts paid to DISTRIBUTOR in advance by subscribers for their subscriptions to the Newspaper, and the payment of any liquidated damages as set forth in paragraph 17 below. PUBLISHER shall not be limited to such security for any damage caused by or amounts due from DISTRIBUTOR.

16.    Unless terminated in a manner prescribed below, this Agreement shall continue in full force and effect as stated at paragraph 20 herein. Moreover:

(a)    Either party may terminate this Agreement, with or without cause, upon thirty (30) days advance written notice.

(b)    PUBLISHER may terminate this Agreement without prior notice upon DISTRIBUTOR's falsification of any report submitted to PUBLISHER, commission of any wrongful act resulting in loss, damage or injury to PUBLISHER, failure to perform under paragraph 8, or any breach of the terms of this Agreement.

(c)    PUBLISHER may terminate this Agreement or suspend its performance hereunder without prior notice in the event PUBLISHER's facilities are damaged or destroyed or PUBLISHER's performance hereunder is prevented or hindered by labor disturbances, including but not limited to strikes and picketing, or by acts of God, the elements, order of government, civil or military authority, or any other cause (whether similar or dissimilar to the above mentioned) not within the reasonable control of PUBLISHER.

17.    It is mutually recognized that customer satisfaction is an essential element of this Agreement. It is further recognized that DISTRIBUTOR's failure to deliver his/her route, or to provide adequate notice of his/her intent to terminate this Agreement, as required by paragraph 16(a) above, would significantly impair PUBLISHER's ability to ensure delivery of its publication(s) to its customers, and that PUBLISHER's damages in this respect are difficult to calculate precisely. It is therefore agreed that in the event DISTRIBUTOR fails to deliver his/her route, or ceases to perform delivery services under this Agreement without first complying with the requirements of paragraph 16(a), PUBLISHER may charge DISTRIBUTOR an amount of $.50 $^{\underline{00}}$ for each and every day that DISTRIBUTOR is in default of his/her delivery obligations, up to a maximum of $150 $^{\underline{00}}$ which amount is a reasonable estimate of PUBLISHER's damages. These liquidated damages may be charged against and deducted from DISTRIBUTOR's security bond as established under paragraph 15 herein.

18.    This Agreement is intended as the final, complete and exclusive statement of the terms of the parties' agreement. This Agreement cannot be modified in any respect except in writing signed by DISTRIBUTOR and PUBLISHER's Circulation Manager. PUBLISHER does not waive any contractual provision herein by failing to enforce it. Additionally, the parties agree that this Agreement shall supersede all previous contracts or agreements, whether written or oral, between PUBLISHER and DISTRIBUTOR.

19.    DISTRIBUTOR shall not be entitled to credit for unsold newspapers returned via newsstands or dealers that may be on DISTRIBUTOR's APR.

26.   This Agreement shall remain in effect for the following period, subject to the qualifications found in paragraph 16, beginning _Jan. 16_, 20 20 and ending _Jan 15_, 20 21.

_1-21-20_
DATE

_Mauyh Syill_ (signature)
DISTRIBUTOR

_1/16/20_
DATE

_Losli Prenan_ (signature)
REPRESENTATIVE OF THE PAXTON MEDIA GROUP

THIS CONTRACT AND AGREEMENT NOT BINDING ON
PAXTON MEDIA GROUP
UNLESS SIGNED BY THE CIRCULATION DIRECTOR
FOR *THE JONESBORO SUN*

By: _____
CIRCULATION DIRECTOR